# EXHIBIT AE

**Maggie LaPrade**

| | |
|---|---|
| From: | Maggie LaPrade [mlaprade@qwestoffice.net] |
| Sent: | Friday, August 15, 2014 11:46 AM |
| To: | 'Christy_Ferasin@azd.uscourts.gov' |
| Subject: | Howard Cotterman |
| Attachments: | Cotterman, Howard- letter to C. Ferasin.pdf |

Ms. Ferasin,

Attached please find a letter from our client. Let me know if you are unable to read it.

Thanks,

**Maggie LaPrade**
Legal Assistant
DONAU & BOLT
3505 N. Campbell Ave, Ste 501
Tucson, Arizona 85719-2033
Phone: (520) 795-8710
Fax: (520) 795-0308

CONFIDENTIALITY: This email message is intended for the individual or entity to which it is addressed, and may contain information that is privileged, confidential or exempt from disclosure under applicable law. Unauthorized use, distribution or disclosure is prohibited. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this message in error, please notify the sender immediately and delete the original message from your email.    Thank you.

August 8, 2014
TO: Christy Ferasin, Probation Officer
FROM: Howard Cotterman
Subject: Follow-up to August 7 interview

    This background is for your information, Christy, as you consider the factors in my sentencing. I'll try to fill in some of the details related to the interview. As I acknowledged in that interview, there are no excuses for what I did. But I needed to get at the reasons in order to fix my wrong thinking. I mentioned that my wife, Maureen, and my son, Greg, have helped me to learn and to grow past my misguided beliefs — also to deal with my sorrow, regrets, and depression.

    I intended no harm and truly believed that, since I made sure my granddaughter was unaware of my actions, no harm was done. Maureen and Greg helped me see through that blind spot and recognize the anguish I had caused, and the underlying reasons.

    Until this happened, I had been a major positive influence in the lives of my son, Scott, his wife, Lucy, and all three of their kids. When the last baby was born with critical heart defects, I helped ensure his recovery and health by extending the electrical utility service to their remote Alaska homestead. Over the years I have provided their school clothes and the Santa gifts. I paid for Lucy's EMT training to enter that field. I helped Lucy find suitable housing and to clean up her credit to qualify for it. With safety in mind, I provided swimming lessons for Lucy and the kids. I implored Scott to join Chicago's Lost Child program when Wesley and Tyler tried to run away from home. Maureen and I helped address Tyler's reading problems and ADHD. I visited Tyler's school on multiple occasions and followed up by phone and email with Tyler's teacher. In short, I was just about everything a grandfather could be at a difficult period for the family and thousands of miles apart.

    It grieves me greatly that I foolishly lost those mutual caring and loving relationships forever. I betrayed my granddaughter's trust and forsook my caretaker responsibility. I am terribly sorry that I took advantage of my granddaughter and distressed her so.

    But please understand that this incident bears no substantive resemblance to my actions or flawed reasoning that led to my incarceration twenty-two years ago. That episode followed the San Francisco seminar on investigative reporting that I mentioned as the first step in a career change. One of the students at that seminar

Case 4:16-cv-00667-RCC   Document 49-31   Filed 04/06/20   Page 4 of 5
Case 4:16-cv-00667-RCC   Document 1-34   Filed 10/08/16   Page 4 of 5

page 2

passed on a rumor of daycare abuses in my area. My subsequent investigation, though misguided, was done openly on the naive belief that I would be exonerated by ends that justified the means. The grandiose thinking of justification and entitlement were successfully resolved by extensive counseling before and after incarceration. In contrast to this case, I had taken only one photo, and in response to a child's specific complaint. The cases have nothing in common in either my intent or behavior. Three psychological evaluations, including one by a court-appointed psychiatrist, found no evidence of pedophilia, sexual interest in children, or predatory tendencies. That's why I mentioned the recent Derek Hough interview by where he challenged the myth that a provocatively choreographed dance routine suggests a sexual interest between the dance partners. His message, that things aren't always how they appear, resonated with my personal experiences and my wife's competitive dancing history. It's dangerous to speculate about another's motivation without sharing — or at least professionally comprehending — that person's experiences, attitudes and personality traits. But that's exactly what the prosecution did in my case now at issue.

    In the interview, we briefly touched on the differences between my behavior and those targetted by the statutes. My granddaughter's testimony confirmed that I had taken great care to prevent her — or anyone else — from being aware of anything. While the secrecy itself exposed a character wart I had to remove, it's in stark contrast to the usual offenders. The agent who performed the forensic analysis testified that there was no evidence that any of the contraband was sent out. His testimony also established that I did not select text files or images from the Internet nor even seek such materials. In fact, my computer contains a complete record of my email responses to to sexually-oriented spam, demanding that I be removed from any future solicitations.

    While I have been paying dearly for my inexcusable behavior and my granddaughter's distress, the privation suffered by the other major victim, my wife, just gets worse. Maureen endures an incalculable loss — irreplaceable golden years together, right at the threshold of our long-awaited retirement. Her physical and psychological health have deteriorated as much as mine.

    I had never before required medication other than the usual antibiotics to cure a specific illness. I mentioned that I was in good health upon incarceration seven years ago. Since then I've been diagnosed with an enlarged prostate, and my high blood pressure

Case 4:16-cv-00667-RCC   Document 49-31   Filed 04/06/20   Page 5 of 5
Case 4:16-cv-00667-RCC   Document 1-34   Filed 10/08/16   Page 5 of 5

page 3

has steadily worsened. I'm no longer able to maintain good health through careful attention to diet and exercise. My Atenolol prescription has doubled and Amlodipine added. I'm on Pravastatin for high cholesterol. Just recently I was diagnosed with thyroid and esophageal dysfunction. I'm starting a new thyroid stimulant drug and the esophagus will likely require corrective surgery.

The prison environment, difficult for anyone in their seventies, is particularly problematic at CCA. The many hardships at CCA are well known, so this is just to note that my seven years have been very hard time. For families, especially Maureen and me, the most harmful and regressive CCA practice has been the lack of reasonable visiting. Not only is the visiting limited to about an hour a week, but visits are conducted while fully restrained and only through a telephone. Just entering her seventies, the risks to Maureen, along with the physical and financial demands of traveling hundreds of miles for a one-hour telephone connection, are just too great. Consequently, my wife and I have had absolutely no physical contact for seven years and no visits at all for the last five.

Again, nothing in this letter is to excuse what I did. As flawed as my thinking was, I needed for you to know about how, with my family's help and their tough love, I have gained new self-awareness and attitudes. Life has new meaning. My anger and doubts — mostly directed at myself — have been replaced by more constructive remorse and self-reproach.

Sincerely,
Howard Cotterman