MICHAEL BAILEY
United States Attorney
District of Arizona
CARIN C. DURYEE
Assistant United States Attorney
SHELLEY K.G. CLEMENS
Assistant United States Attorney
405 West Congress, Suite 4800
Tucson, Arizona 85701-5040
Telephone: 520-620-7300
Email: carin.duryee@usdoj.gov
shelley.clemens@usdoj.gov
Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>           Plaintiff,<br><br>     v.<br><br>Howard Wesley Cotterman,<br><br>           Defendant/Movant. | CV 16-0667-TUC-RCC<br><br>**GOVERNMENT'S OPPOSITION TO AMENDED MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY** |

       The United States of America, by and through its attorneys undersigned, hereby files this response asking the Court to deny defendant Howard Wesley Cotterman's ("the defendant" or "Cotterman") Amended § 2255 Motion. The defendant alleges that his trial and appellate counsel were ineffective on seven grounds, and that the trial court committed plain error in its advisement regarding his waiver of his rights to a jury trial and to testify at trial. The defendant has again failed to raise a colorable claim of ineffectiveness or any claim under 28 U.S.C. § 2255.  All of his arguments rely on conclusory claims which are not factually supported by any credible evidence, and do not meet his burden of proof. His motion should be denied.

///

///

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. Statement of Facts

The defendant filed his Motion to Set Aside, Vacate, or Correct Judgment by a Person in Federal Custody on October 8, 2016. (CV 1.)[1] On February 1, 2017, the Court ordered the government to respond. (CV 7.) The government responded on December 13, 2017 (CV 18), and moved to strike interviews and other exhibits that were unauthorized expansions of the record. (CV 16.) In response, the Court struck several exhibits which accompanied the original motion (CV 26), and, after obtaining leave from the Court to expand the record (CV 27 & 28), the defendant submitted interrogatories to his trial and appellate counsel, and has submitted responses to those interrogatories along with his amended motion, filed on April 6, 2020. (CV 49).

The amended petition does not raise new arguments, and again fails to establish any ineffectiveness of counsel that would support granting the amended petition.

### A. Nature of the Case; Course of Proceedings

On June 27, 2007, a Tucson, Arizona grand jury charged the defendant in an 8-count indictment with various child pornography offenses. (CR 9.) He was charged with: two counts of production of child pornography, in violation of 18 U.S.C. §§ 2251(a),(e) and 2256(2); transportation and shipping, receipt, and possession of child pornography, in violation of 18 U.S.C. §§ 2252(a)(4)(B), (b)(2) and 2256(2); importation and transportation of obscene material, in violation of 18 U.S.C. §§ 1462(a), 1465, 2252(a)(1),(2) and (b)(1); and flight to avoid prosecution, in violation of 18 U.S.C. § 1073. (CR 9.)

Significant portions of the evidence in this case were obtained through a search of the defendant's laptop computer that was seized at the Lukeville, Arizona Port of Entry (POE) at the U.S./Mexico border. The defendant filed a motion to suppress evidence seized from his computer. (CR 17.) After hearing evidence and argument, the District Court

---

[1] "CV" denotes docket entries from the instant civil case (CV16-0667-TUC-RCC). "CR" denotes docket entries from the underlying criminal case (CR07-1207-TUC-RCC). "CA" denotes docket entries from the appeal (CA14-10454).

granted the defendant's motion to suppress.  (CR 71.)  The government appealed.  (CR 72.)  On March 30, 2011, the Ninth Circuit Court of Appeals reversed and remanded, holding that the District Court erred in suppressing the evidence that was lawfully obtained during a border search.  *United States v. Cotterman*, 637 F.3d 1068, 1083 (9th Cir. 2011).  The defendant filed a petition for en banc review of this matter and the Ninth Circuit granted that request on March 19, 2012.  On March 8, 2013, the Ninth Circuit reversed the District Court's order.  *United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013) (en banc).

This matter proceeded to a bench trial on June 10, 2014.  (CR 126.)  Before trial and based on the government's motion, the Court dismissed Counts 4, 7 and 8 of the indictment.  (CR 136; PSR ¶ 10.)  The Court found the defendant guilty of Counts 1, 2, 3, 5 and 6.  (CR 151.)

On September 29, 2014, the Court sentenced the defendant to 30 years in prison on Counts 1 and 2, to run concurrent to one another and Counts 3 and 5, and consecutive to Count 6; 20 years on Count 3, to run concurrent to Counts 1, 2, 5 and consecutive to Count 6; 10 years on Count 5, to run concurrent to Counts 1, 2, 3 and 6; and 5 years on Count 6, to run consecutive to Counts 1, 2, 3, and 5.  (CR 151.)  This sentence resulted in a total sentence of 35 years in prison for all counts.

Cotterman filed a notice of appeal on October 11, 2014.  (CR 147.)  On October 14, 2015, the Ninth Circuit Court of Appeals affirmed his conviction and sentence in an unpublished memorandum disposition.  *United States v. Cotterman,* 619 F. App'x. 654 (9th Cir. 2015) (unpublished).  The Ninth Circuit mandate from his direct appeal was issued on November 12, 2015.  (CR 165.)

**B.  Case Investigation**

The Ninth Circuit Court of Appeals stated the facts of this case as follows:

Howard Cotterman and his wife were driving home to the United States from a vacation in Mexico on Friday morning, April 6, 2007, when they reached the Lukeville, Arizona, Port of Entry. During primary inspection by a border agent, the Treasury Enforcement Communication

System ("TECS") returned a hit for Cotterman. The TECS hit indicated that Cotterman was a sex offender—he had a 1992 conviction for two counts of use of a minor in sexual conduct, two counts of lewd and lascivious conduct upon a child, and three counts of child molestation—and that he was potentially involved in child sex tourism. Because of the hit, Cotterman and his wife were referred to secondary inspection, where they were instructed to exit their vehicle and leave all their belongings in the car. The border agents called the contact person listed in the TECS entry and, following that conversation, believed the hit to reflect Cotterman's involvement "in some type of child pornography." The agents searched the vehicle and retrieved two laptop computers and three digital cameras. Officer Antonio Alvarado inspected the electronic devices and found what appeared to be family and other personal photos, along with several password-protected files.

Border agents contacted Group Supervisor Craig Brisbine at the Immigration and Customs Enforcement ("ICE") office in Sells, Arizona, and informed him about Cotterman's entry and the fact that he was a sex offender potentially involved in child sex tourism. The Sells Duty Agent, Mina Riley, also spoke with Officer Alvarado and then contacted the ICE Pacific Field Intelligence Unit, the office listed on the TECS hit, to get more information. That unit informed Riley that the alert was part of Operation Angel Watch, which was aimed at combating child sex tourism by identifying registered sex offenders in California, particularly those who travel frequently outside the United States. She was advised to review any media equipment, such as computers, cameras, or other electronic devices, for potential evidence of child pornography. Riley then spoke again to Alvarado, who told her that he had been able to review some of the photographs on the Cottermans' computers but had encountered password protected files that he was unable to access.

Agents Brisbine and Riley departed Sells for Lukeville at about 1:30 p.m. and decided en route to detain the Cottermans' laptops for forensic examination. Upon their arrival, they gave Cotterman and his wife *Miranda* warnings and interviewed them separately. The interviews revealed nothing incriminating. During the interview, Cotterman offered to help the agents access his computer. The agents declined the offer out of concern that Cotterman might be able to delete files surreptitiously or that the laptop might be "booby trapped."

The agents allowed the Cottermans to leave the border crossing around 6 p.m., but retained the Cottermans' laptops and a digital camera. Agent Brisbine drove almost 170 miles from Lukeville to the ICE office in Tucson, Arizona, where he delivered both laptops and one of the three digital

- 4 -

cameras to ICE Senior Special Agent & Computer Forensic Examiner John Owen. Agent Owen began his examination on Saturday, the following day. He used a forensic program to copy the hard drives of the electronic devices. He determined that the digital camera did not contain any contraband and released the camera that day to the Cottermans, who had traveled to Tucson from Lukeville and planned to stay there a few days. Agent Owen then used forensic software that often must run for several hours to examine copies of the laptop hard drives. He began his personal examination of the laptops on Sunday. That evening, Agent Owen found seventy-five images of child pornography within the unallocated space of Cotterman's laptop.

Agent Owen contacted the Cottermans on Sunday evening and told them he would need Howard Cotterman's assistance to access password-protected files he found on Cotterman's laptop. Cotterman agreed to provide the assistance the following day, but never showed up. When Agent Brisbine called again to request Cotterman's help in accessing the password-protected files, Cotterman responded that the computer had multiple users and that he would need to check with individuals at the company from which he had retired in order to get the passwords. The agents had no further contact with Cotterman, who boarded a flight to Mexico from Tucson the next day, April 9, and then flew onward to Sydney, Australia. On April 11, Agent Owen finally managed to open twenty-three password-protected files on Cotterman's laptop. The files revealed approximately 378 images of child pornography. The vast majority of the images were of the same girl, approximately 7–10 years of age, taken over a two to three-year period. In many of the images, Cotterman was sexually molesting the child. Over the next few months, Agent Owen discovered hundreds more pornographic images, stories, and videos depicting children.

*Cotterman*, 709 F.3d at 957-59.  In some of the images and videos, the defendant's fingers are shown spreading the vaginal opening of the child victim.  (CR 136; PSR ¶ 14.)  The defendant had even created a collage of numerous close-up views of these images depicting his victim's genitalia.  Agent Owen also found approximately 300 text stories that describe acts of child sexual abuse and incest.  *Id.*

In 1992, the defendant was convicted in California of thirty-three offenses, which included two counts of use of a minor in sexual conduct, two counts of lewd and lascivious conduct upon a child, and three counts of annoy/molest a child.  (CR 136; PSR ¶ 43.)  A review of the facts underlying those convictions reveals that the defendant went to several

daycare/preschool centers over the course of three days in August 1991 and falsely represented himself to be a doctor or social services inspector investigating acts of child abuse. *Id.* Under those pretenses, he gained access to children. *Id.* He photographed the pubic area of at least two six-year old girls. *Id.* He had the children take off their clothes and he took pictures of them. *Id.* He also allegedly penetrated one child victim's vaginal opening with his finger. (CR 136; PSR ¶ 43.)

### C. **Trial**

A bench trial was held in this case, commencing on June 10, 2014. (CR 126.) Before trial and based on the government's motion, the court dismissed Counts 4, 7 and 8 of the indictment. (CR 136; PSR ¶ 10.) In addition, the parties entered into stipulations of fact, which were signed by the defendant, trial counsel, government counsel, and filed with the court on June 6, 2014. (Stipulation of Fact, CR 117.) The defendant also waived his right to a jury trial, and filed two notices of his waiver on June 9, 2014 and June 10, 2014. (Waiver of Jury Trial, CR 120 and 127.) Cotterman did not testify at trial.

After trial, the district court found the defendant guilty of Counts 1, 2, 3, 5 and 6. (CR 151.) Counts 1 and 2 are convictions of production of child pornography, violations of 18 U.S.C. § 2251(a), which require a minimum sentence of 15 years and a maximum sentence of 30 years. 18 U.S.C. § 2251(a) and (e). Count 3 is a conviction of transportation of child pornography, a violation of 18 U.S.C. § 2251(a)(1), which requires a minimum sentence of 5 years and a maximum sentence of 20 years. 18 U.S.C. § 2252(a)(1) and (b)(1). Count 5 is a conviction of possession of child pornography, a violation of 18 U.S.C. § 2252(a)(4)(B), which, at the time of the offense, allowed for a maximum sentence of 10 years. 18 U.S.C. § 2252(a)(4)(B) and (b)(2). Count 6 is a conviction of importation of obscene material, a violation of 18 U.S.C. § 1462(a), which allows for a sentence of up to 5 years imprisonment. 18 U.S.C. § 1462(a).

### D. **Sentencing**

At the sentencing hearing on September 29, 2014, the court permitted the parties to argue their respective positions regarding the defendant's sentence, as well as the

sentencing factors under 18 U.S.C. § 3553(a).  (CR 162, RT 9/29/14 at 4-18.)  The defense requested the court sentence the defendant to 15 years.  (CR 162, RT 9/29/14 at 5; CR 140 at 3.)    Defense counsel and the defendant argued factors under § 3553(a), including the defendant's advanced age of 74, his prior substantial financial assistance to the victim and her family, the absence of any proof that Cotterman had ever distributed any child pornography, his expressed remorse, and the fact that the victim was not aware that the defendant was photographing her and her genitalia.   (CR 162, RT 9/29/14 at 4-18.)  Specifically, the defendant made statements attempting to minimize his actions in this case:

> I think what really opened my eyes to the whole situation and what I was causing more than anything else was that no one involved, and I mean no one, acted in [Victim's] best interests.  The agents who conducted the interview zealously pursued a conviction and so did the prosecution.  [Victim's] mother, in her own words and also the words of the probation officer, are consumed with anger.
> And all of these elements and all of these factors conspired to put [Victim] back on the stand to relive the events and the trauma, and that was needless. . . .
> I deeply regret the loss of trust, the betrayal of trust for [Victim] and the distress I caused when I did not respect her space.

(CR 162, RT 9/29/14 at 6-14).

The government requested the court take into account all of the § 3553(a) factors, specifically the history and characteristics of the defendant, as well as deterrence and the need to protect the public when determining an appropriate sentence.  (CR 135 at 5-7.)  The government recommended a sentence of 60 years.  (CR 135 at 3-4.)

The child victim and her mother made statements to the court regarding the impact of the defendant's actions on them.  (CR 162, RT 9/29/14 at 19-25.)  The child victim asked the district court to sentence the defendant to 60 years in prison.  (CR 162, RT 9/29/14 at 24-25.)

The U.S. Probation office calculated Cotterman's guideline sentence as life.  (CR 136 at 14.)  The U.S. Probation officer also noted in the PSR why she did not believe that Cotterman would receive an enhancement for his prior conviction.  (CR 136 at 3, ¶11.)

Specifically, the probation officer stated the following:

> It is noted that in 2008 the government filed a Notice of Prior Conviction alleging the defendant had prior convictions in California . . . that would result in various statutory sentencing enhancements to include mandatory life imprisonment on Counts 1 and 2. It should be noted, however, that the presentence report does not propose application of any of the prior-conviction enhancements authorized under 18 U.S.C. §§ 2251(e), 2252(b)(1), 2252(b)(2) and 3559(e). This is because, under the strict standards of the "categorical approach," none of the California convictions at issue (i.e., the violations of Penal Code §§ 288, 647.6 and 311.4) would appear to qualify as predicate sex crimes.

*Id.* The probation officer also noted that "[i]t does not appear the defendant did anything to clearly demonstrate acceptance of responsibility prior to trial." *Id.* at 5, ¶20. Despite calculating Cotterman's sentence to be life under the U.S.S.G., the probation officer recommended that the court sentence the defendant to a total of 30 years imprisonment. *Id.* at 14.

At the defendant's sentencing hearing, the District Court judge stated that he reviewed both parties' sentencing submissions. (CR 162, RT 9/29/14 at 3-4.) The judge stated at the sentencing hearing that the sentencing guideline calculation for the defendant was "life," however "the statutory maximum of Counts 1 and 2 is 30 years." (CR 162, RT 9/29/14 at 25.) The court then varied downward to impose the sentence totaling 35 years and stated, "Mr. Cotterman, the court has every confidence that the sentence just imposed results in you spending the rest of your life in prison. The Court believes that's an appropriate sentence." (CR 162, RT 9/29/14 at 25-26.)

**E. Appeal**

Cotterman pursued a direct appeal (CA 14-10454). In his appeal, he argued that the District Court plainly erred in the procedural aspects of the sentencing and abused its discretion by imposing a substantively unreasonable sentence. (CA 18, Op. Br. at 12-23.) Specifically, the defendant argued that the district court failed to consider his age, and that there was no evidence that he distributed the child pornography videos and photographs

- 8 -

that he produced and possessed. *Id.* at 17-19. In addition, the defendant asserted that the district court failed to consider "in open court" that he had been "financially generous and caring of the victim and her family," that the child victim was "unaware she was being photographed" by the defendant, that the defendant continues to have the support of his wife and son, and that the child pornography images he produced did not depict bestiality, cruelty, or masochistic or sadistic behavior. *Id.* at 20. The defendant also asserted that the sentence imposed by the district court was substantively unreasonable, because the child pornography images of the child victim "were not disseminated to the public," "the victim was unaware of being photographed," and "[t]here was no evidence of beastiality [sic] or cruelty, or masochistic treatment." (CA 18, Op. Br. at 24-25.) In addition, the defendant asserted that the sentence was substantively unreasonable, because the record did not show that the district court "placed any weight on Cotterman's expressed remorse." *Id.* at 26. The Ninth Circuit rejected all of Cotterman's arguments in a memorandum disposition. *United States v. Cotterman,* 619 F. App'x. 654 (9th Cir. 2015) (unpublished).

## II. **ARGUMENT**

### A. **Law**

It is well-settled law that grounds "that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Id.* Collateral review is an extraordinary remedy and "will not be allowed to do service for an appeal." *Bousley v. United States*, 523 U.S. 614, 621 (1998) (quoting *Reed v. Farley*, 512 U.S. 339, 354 (1994)). "The reasons for narrowly limiting the grounds for collateral attack on final judgments are well known and basic to our adversary system of justice." *United States v. Addonizio*, 442 U.S. 178, 184 (1979).

Under 28 U.S.C. § 2255(a), cognizable claims are unconstitutional or illegal sentence, lack of jurisdiction, a sentence exceeding the statutory maximum, or a sentence otherwise subject to collateral attack. *See* Rules Governing Section 2255 Proceedings 1, Advisory Committee Notes (1976) (quoting *Davis v. United States*, 417 U.S. 333 (1974) ("holding that it is not true that every asserted error of law can be raised on a § 2255 motion,

and that the appropriate inquiry is whether the claimed error of law was a fundamental defect which inherently results in a complete miscarriage of justice, and whether it presents exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent") (some punctuation omitted)). None of the defendant's grounds are cognizable under § 2255.

If a petitioner asserts "no more than conclusory allegations, unsupported by facts and refuted by the record," a district court may deny a § 2255 motion without an evidentiary hearing. *United States v. Quan*, 789 F.2d 711, 715 (9th Cir. 1986). The court may deny a hearing if petitioner's allegations, viewed against the record, fail to state a claim for relieved or "are so patently incredible or patently frivolous as to warrant summary dismissal." *United States v. Mejia-Mesa*, 153 F.3d 925, 931 (9th Cir. 1998). No hearing is required if credibility can be decided based on documentary testimony and evidence in the record. *Shah v. United States*, 878 F.2d 1156, 1159 (9th Cir. 1989). Judges may supplement the record with their own recollections of the proceedings and use common sense. *Id.* Conclusory statements, taken alone, are insufficient evidence to trigger the requirement of a hearing. *United States v. Johnson*, 988 F.2d 941, 945 (9th Cir. 1993).

The general rule is that, to prevail on a claim of ineffective assistance of counsel, a defendant must prove: 1) his counsel's representation fell below an objective standard of reasonableness; and 2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *United States v. Rodrigues*, 347 F.3d 823, 836 (9th Cir. 2003); *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Because the *Strickland* test is conjunctive, a defendant's petition may be dismissed without a hearing if he fails to satisfy either prong. *United States v. Schaflander*, 743 F.2d 714, 717 (9th Cir. 1985) (a hearing is not necessary if the defendant's allegations, when viewed against the record, "do not state a claim for relief or are so palpably incredible or patently frivolous as to warrant summary dismissal").

The Supreme Court has stated that judicial scrutiny of counsel's performance must be highly deferential, making every effort to eliminate the distorting effects of hindsight.

As a general rule, courts will not second-guess the strategic choices made by counsel. *See Strickland*, 466 U.S. at 689-90. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* "A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690.

To show prejudice from counsel's alleged errors, "'[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (the prejudice analysis focuses on whether the result of the proceeding was fundamentally unfair or unreliable because of counsel's ineffectiveness). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland,* 466 U.S. at 697.

The Sixth Amendment right to effective counsel applies equally to trial and appellate counsel. *Ha Van Nguyen v. Curry*, 736 F.3d 1287, 1293 (9th Cir. 2013). Claims of ineffective appellate counsel are also reviewed according to the *Strickland* standard. *Bailey v. Newland*, 263 F.3d 1022, 1028 (9th Cir. 2001). Just as a defendant must overcome a strong presumption that the challenged act or omission "might be considered sound trial strategy," *Strickland*, 466 U.S. at 689, he must overcome that presumption regarding appellate strategy. The two *Strickland* prongs "partially overlap when evaluating the performance of appellate counsel. In many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the

weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy. . . . Appellate counsel will therefore frequently remain above an objective standard of competence (prong one) and have caused her client no prejudice (prong two) for the same reason – because she declined to raise a weak issue." *Id*. at 1028-29 (quoting *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989)). *See Rogovich v. Ryan*, 694 F.3d 1094, 1106 (9th Cir. 2012) (counsel is not required to raise an "untenable issue" on appeal).

Section 2255 was not designed to give prisoners another appeal. *See United States v. Dunham*, 767 F.2d 1395, 1396 (9th Cir. 1985) ("[s]ection 2255 is not designed to provide criminal defendants repeated opportunities to overturn their convictions on grounds which could have been raised on direct appeal"); *United States v. Moss*, 252 F.3d 993, 1001-03 (8th Cir. 2001) (habeas relief is an extraordinary remedy which is not designed to do the service of an appeal, addressing default and *Apprendi* claims raised on habeas review). "If a criminal defendant could have raised a claim of error on direct appeal but nonetheless failed to do so, he must demonstrate both cause excusing his procedural default, and actual prejudice resulting from the claim of error." *United States v. Johnson*, 988 F.2d 941, 945 (9th Cir. 1993) (citing *Frady*, 456 U.S. at 168). The "cause and prejudice" standard requires the prisoner to show not only that "some objective factor external to his defense" impeded his efforts to raise the issue as required by each relevant procedural rule," *Coleman v. Thompson,* 501 U.S. 722, 753 (1991), but also that the error he alleges "worked to his *actual* and substantial disadvantage, infecting his entire trial with error," *Frady*, 456 U.S. at 170 (emphasis in original). The "cause and prejudice" standard is more difficult for petitioners to meet than the plain error standard, which applies to defaulted claims on direct review. *See Frady*, 456 U.S. at 164-66.

///

///

**B. Ground 1 – Trial Counsel Provided Effective Assistance Throughout The Plea Bargaining Stage**

Cotterman argues that his trial counsel was ineffective in representing him during the plea bargaining stage of his case. (CV 49, pp. 9-19.) In his amended §2255 motion, Cotterman flatly asserts that his trial counsel failed to inform him of a plea offer his trial counsel had negotiated with the prosecutor, and that his trial counsel did not work hard enough throughout the pretrial litigation phase of the case to obtain a better plea offer. (CV 49, pp. 12-14.) Cotterman also claims that he was not informed of a specific plea offer of 12-20 years that was made by the prosecutor before the motion to suppress was litigated. (CV 49, p. 4.) However, his trial counsel disputes that claim, and the exhibits attached to Cotterman's amended motion indicate that he had been consulted. (CV 49, Exhibit X, ¶ 5.)

Trial counsel, Mr. Donau, disputes the defendant's claim that he was not consulted about the initial plea offer, and has stated (and would testify) that he never rejected a plea offer or made any counter-offer without first consulting his client. (See Affidavit of Alfred Donau, III, filed herewith, at ¶ ¶ 6-8.) Although there was an interim time frame where Mr. Donau did not represent the defendant (while the case was on appeal regarding the suppression issue), he would testify that during preparation for trial, he did continue to explore the possibility of a plea offer which his client would accept; however, the Government declined to make such an offer. (CV 49, Ex. X, ¶ 6.)

More importantly, Cotterman was not entitled to any plea offer at all, much less so after the government had extensively litigated this matter. *Missouri v. Frye*, 566 U.S. 134, 148 (2012) (finding that "a defendant has no right to be offered a plea"). The letters attached to the defendant's motion reflect early discussions to determine whether a plea would be accepted. That they did not continue is not surprising, given the fact that the defense won the suppression motion. Negotiating a plea agreement when the evidence necessary for a conviction had been suppressed would make no sense. Likewise, plea negotiations could not have been expected to take place while the suppression matter was on appeal.

In another allegation, Cotterman asserts that the prosecutors and trial counsel

involved in the case misunderstood the effect that his prior conviction would have on his potential sentence, and thus, this misunderstanding rendered trial counsel ineffective. (CV 49, pp. 14-17.) During the early stages of the case, trial counsel and government counsel believed that the defendant's prior California conviction would qualify as a predicate offense requiring a mandatory life sentence.[2] In 2008, government counsel filed a Notice of Prior Conviction in this matter. (CR 28.)[3] Government counsel withdrew that notice on the first day of trial, and, in the PSR, the probation office stated that the prior conviction did not qualify for the sentencing enhancement. (CR 136 at 3, ¶11.) Specifically, at trial, the Government stated that it was withdrawing the notice, but that it would not change its sentencing recommendation.

> MS. DURYEE: In addition, the Government, you noticed in that document yesterday as well, I bet, Your Honor, that the Government agreed to withdraw the 3559(e) notice which was filed in 2008. Maybe it was 2007. It won't change the sentencing requests though.

(RT 6/10/14 at 7.)

In the PSR, the probation officer stated:

> It should be noted, however, that the presentence report does not propose application of any of the prior-conviction enhancements authorized under 18 U.S.C. §§ 2251(e), 2252(b)(1), 2252(b)(2) and 3559(e). This is because, under the strict standards of the "categorical approach," none of the California convictions at issue (i.e., the violations of Penal Code §§ 288, 647.6 and 311.4) would appear to qualify as predicate sex crimes.

---

[2] In fact, at the time this case was charged, the judicially noticeable documents available in connection with Cotterman's prior convictions likely would have triggered a mandatory life sentence. *Descamps v. United States*, 133 S.Ct. 2276 (2013), which substantially changed the categorical analysis, was not decided until well after the notice of intent to seek the enhancement was filed in this case.

[3] Pursuant to *Apprendi v. New Jersey*, 430 U.S. 466 (2000), and *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), the government must continue to plead in the indictment and be prepared to prove to juries beyond a reasonable doubt facts, other than the fact of a prior conviction, that increase a statutory maximum sentence.

(CR 136 at 3, ¶11.) Cotterman now argues that trial counsel was ineffective, because trial counsel's mistaken belief that Cotterman would face a mandatory life sentence caused him to not seek or consider plea offers with lower sentences. This argument is completely lacking in factual support.

Any early discussions between trial counsel and government counsel about potential sentences and plea offers were purely discussion. Even if the attorneys believed that a particular sentencing outcome was likely, it was understood that any sentence would ultimately be determined by the court, not the parties. Because the government ultimately elected not to pursue the enhancement, the Court never made an explicit ruling on whether Cotterman's prior conviction qualified for the enhancement. However, the government and defendant's trial counsel both understood throughout this case that the guidelines would subject the defendant to life imprisonment, and that the government would be seeking a sentence that would be an effective life sentence for the defendant.

Moreover, Cotterman's argument regarding any alleged mistake by the attorneys is a red herring, because the focus is on whether or not trial counsel conveyed any of the plea offers, rather than trial counsel's advice on whether or not to accept the offers. Trial counsel rejected the offers only with his client's approval. (See Affidavit of Alfred Donau, III, ¶¶ 6-8.)

Cotterman suffered no harm even if the attorneys were mistaken because, even without the prior conviction invoking an enhancement, Cotterman's U.S.S.G. calculated sentence was "life." Thus, whether the enhancement was invoked or not, his sentencing recommendation was the same. As trial counsel also expressed, the mandatory minimum of 15 years for production of child pornography and the defendant's age made any sentence a likely life sentence in trial counsel's eyes. (See Affidavit of Alfred Donau, III, ¶ 16.)

The defendant has failed to meet both prongs of the *Strickland* test on his assertions pertaining to plea negotiations. He cannot show that there is a reasonable probability that, had his lawyer negotiated for a better plea offer, it would have been offered, especially given the U.S. Attorney's Office's typical practice of revoking plea offers in cases where

motions have been filed and litigated. Further, he has failed to establish that his lawyer did not convey any of the offers to him, or that if he had known about any plea offers, he would have accepted them. These allegations do not warrant a hearing or any other relief.

**C. <u>Ground 2 – Defendant Fails to Show his Waiver of Jury Trial Was Not Knowing and Voluntary or That Counsel Was Ineffective For Advising Defendant to Waive Jury Trial.</u>**

Cotterman argues, without any evidentiary support, that his trial and appellate counsel were ineffective in advising him and protecting his right to have a jury trial in this case. He asserts that if he had been properly advised, he would not have executed a jury waiver. (CV 49, pp. 19-32.) The record establishes otherwise.

1. <u>The Record Establishes Defendant's Waiver was Knowing and Voluntary</u>

Federal Rule of Criminal Procedure 23 requires that three conditions be met for a defendant to waive his right to a jury trial. The rule states:

> If the defendant is entitled to a jury trial, the trial must be by jury unless: (1) the defendant waives a jury trial in writing; (2) the government consents; and (3) the court approves.

Fed. R.Crim. Proc. 23(a).

> There is a fourth requirement: the waiver must be knowing and intelligent. *United States v. Duarte–Higareda,* 113 F.3d 1000, 1002 (9th Cir.1997). Although Rule 23 states that the waiver must be in writing, we have held that under certain circumstances an oral waiver may be sufficient. *See United States v. Saadya,* 750 F.2d 1419, 1420 (9th Cir.1985) (citing *United States v. Reyes,* 603 F.2d 69, 71 (9th Cir.1979)). The two forms of waiver are not equal, however. A writing confers on a waiver the presumption that it was made knowingly and intelligently. *See United States v. Cochran,* 770 F.2d 850, 851 (9th Cir.1985) (citing *United States v. Goodwin,* 446 F.2d 894, 895 (9th Cir.1971) (per curiam) and *United States v. Reyes–Meza De Polanco,* 422 F.2d 1304, 1305 (9th Cir.) (per curiam), *cert denied,* 397 U.S. 1081, 90 S.Ct. 1536, 25 L.Ed.2d 817 (1970)).

*United States v. Shorty*, 741 F.3d 961, 965–66 (9th Cir. 2013). In determining whether a waiver is knowing and intelligent, the Ninth Circuit Court of Appeals has encouraged trial

courts, in cases where there is no written waiver, to insure that the defendant knows "(1) twelve members of the community compose a jury; (2) the defendant may take part in jury selection; (3) jury verdicts must be unanimous; and (4) the court alone decides guilt or innocence if the defendant waives a jury trial." *Id.*

The district court is not required to conduct a colloquy in every case. Indeed, a lack of colloquy regarding the waiver is "not a violation of the Constitution . . . nor does it *ipso factor* require reversal." *United States v. Cochran*, 770 F.2d 850, 851 (9th Circ. 1985) (internal citations omitted). The record supports a valid waiver of jury trial where there are "strong indicia the waiver was voluntary, knowing and intelligent." *United States v. Gonzalez-Flores*, 418 F.3d 1093, 1102 (9th Cir. 2005). See also *United States v. Duarte-Higareda*, 113 F.3d 1000, 1002 (9th Cir. 1997).

In this case, Cotterman waived his right to a jury trial both verbally and in writing. (RT 06/10/14 3-5; CR 120 & 127.) There is a presumption that a written waiver is voluntary, knowing and intelligent. *United States v. Cochran*, 770 F.2d at 851. Certain external factors may eliminate this presumption. For instance, if the court has reason to know the defendant suffers from a mental or emotional instability, e.g. *United States v. Christensen,* 18 F.3d 822, 825 (9th Cir. 1995), or the defendant does not speak English, *United States v. Duarte-Hararedo*, 113 F.3d 1000, 1003) (9th Cir. 1997), the court would be on notice that a more extensive colloquy was necessary. The record in this case, however, demonstrates the defendant suffered from no impediment that would have rendered his waiver involuntary.

Defendant's claims that his counsel never intended to conduct a jury trial are irrelevant to the analysis, as the waiver of the jury trial could not have occurred without the defendant's consent. Moreover, the record supports a finding that the defendant's waiver was knowing and voluntary. At a pretrial conference held on February 26, 2014, trial counsel notified the judge that they were requesting a bench trial in the case:

THE COURT:     How long will the trial take?

MR. DONAU: We're working on partial stipulated facts – I suggested to the Government we do a judge trial – partial stipulated facts and partial live witnesses, so it shouldn't take a long time.

THE COURT: What do you call a long time? Less than three days? Four days?

MR. DONAU: Four days max, don't you think?

MS. DURYEE: I'd be surprised if it went beyond three, but it's a little hard to be sure at this point. But assuming that we're a bench trial –

THE COURT: A bench trial I can do in early July, either the week of the 1st or the 8th.

(CR 176, RT 2/26/14 at 3-4.) The defendant did not object to trial counsel's assertions that they were requesting a bench trial and that they expected to agree with the government on some stipulated facts. The trial was ultimately set to begin on June 9, 2014, and at no time between February 26, 2014 and the trial in June 2014 did the defendant raise any objections to his trial counsel's assertions.

To the contrary, on June 9, 2014, the defense filed a Notice of Waiver of Jury Trial. (Waiver, CR 120.) The notice specifically states:

Defendant, HOWARD WESLEY COTTERMAN, through counsel undersigned, hereby gives notice that after being fully informed of his constitutional rights to a jury trial, defendant Cotterman waives those rights and agrees to proceed before a judge without a jury. Additionally, Defendant Cotterman has agreed to the stipulation of certain facts. Those stipulations have been personally signed by Howard Cotterman and previously filed with the court.

*Id.* In addition, the defendant signed a second waiver of trial by jury on the first day of trial. (RT 6/10/14 at 3-5; Waiver, CR 127). This waiver was signed by Cotterman, trial counsel, government counsel, and the trial judge. *Id.* The waiver reads as follows:

The undersigned defendant hereby waives the right to a trial by jury and requests the court to try all charges against him in the case without a jury.

[dated June 10, 2014 and signed by Howard Cotterman]

The undersigned attorney for the defendant herein represents that prior to the signing of the foregoing waiver, the defendant was fully advised as to the rights of an accused under the Constitution and laws of the United States, to a speedy and public trial by jury; and further represents that, in his opinion, the above waiver by the defendant of trial by jury is understandingly made, and recommends to the Court that the waiver be approved.

[dated June 10, 2014 and signed by Alfred Donau]

The United States Attorney hereby consents that the case be tried without a jury.

[dated June 10, 2014 and signed by Carin Duryee]

[dated June 10, 2014 and signed by U.S. District Court Judge Raner Collins]

*Id.*

On the first day of trial, the trial judge conducted a colloquy with the defendant regarding his trial options and choice to sign the jury waiver. (RT 6/10/14 at 3-5.) During this colloquy, Cotterman stated that he had discussed the waiver of a jury trial with trial counsel, and that he, in a prior court hearing, had heard his attorney state, with his assurance, that he intended to proceed with a bench trial. *Id.*

THE COURT: And in fact, I think the last time we were in court he indicated that this was going to be trial in front of the Court, not in front of the jury; correct?

THE DEFENDANT: That's right.

THE COURT: He gave the indication with your assurance that was what you wanted; correct?

THE DEFENDANT: That's correct.

(RT 6/10/14 at 3-4.) The defendant stated that he understood that the burden of proof was the same, but that instead of a jury deciding the verdict, the judge would decide the verdict. (RT 6/10/14 at 4.) He further stated that he was making the decision of his own free will. *Id.* Trial counsel stated that he believed Cotterman understood what he was doing by waiving a jury trial, that counsel had explained the process to Cotterman, and that he believed Cotterman understood it. (RT 06/10/14 4-5) Cotterman expressed no disagreement, surprise, or confusion about his counsel's averment. Nor did he express any hesitation with this decision. Trial counsel has averred that he fully advised defendant of his rights and Cotterman understood those rights. (Affidavit of Alfred Donau, III. ¶ 11.) The defendant's claim that his waiver was not knowing and voluntary is belied by the record.

2. The Record Does Not Support Defendant's Claim that His Waiver of Jury Trial Was Based on Counsel's Allegedly Incorrect Belief that He Was Facing a Minimum Mandatory Sentence of Life.

Cotterman now asserts that his waiver was not made knowingly because he mistakenly believed that his prior criminal conviction would require him to be sentenced to life in prison, but his trial attorney had negotiated with the government that the government would withdraw its Notice of Prior Conviction in exchange for the jury waiver and stipulations. (CV 49, p. 27.) Cotterman argues that his counsel's failure to discover that the prior conviction did not qualify as an enhancement rendered his waiver unknowing. However, his trial counsel disputes that account, and there is no support for that claim anywhere in the record. (See Affidavit of Alfred Donau, III, ¶ 15.)

Cotterman's argument also lacks merit because his mistaken understanding of his potential sentence in no way rendered his waiver of a jury trial unknowing or unintelligent. *Shorty*, 741 F.3d at 965–66 ("the waiver must be knowing and intelligent"). In fact, his argument confirms that his waiver was knowing in that he knew he had the right to a jury trial and understood that he was waiving that right.

Defendant's reliance on the June 5, 2014 email exchange between Mr. Donau and AUSA Duryee also does not demonstrate that government's withdrawal of the § 3559 notice was tied to any requirement that the defendant to waive jury trial or enter into any stipulations. The paragraph cited by the defendant cites to no such agreement. Nor can any inference be drawn that counsel misrepresented to the defendant that the government had agreed to dismiss the 3559 notice in exchange for a jury trial waiver and/or the stipulations. Rather, trial counsel asked the government for a concession on the eve of trial, after the waiver of a jury trial had already been decided. (Affidavit of Alfred Donau, III, ¶ 15.)

Cotterman's claim that his lawyer unilaterally made the decision that the case would proceed as a bench trial is unsupported. He relies on letters exchanged between trial counsel and government counsel almost five years before trial discussing the possibility of proceeding with a bench trial or a stipulated facts trial.[4] (CV 49, p. 20.) These early communications between trial counsel and the government were merely discussions of the bench trial option, and did not operate as any kind of waiver. In addition, these letters were exchanged around the same time that the Government filed its notice of prior conviction, a step required if the government intended to seek the sentencing enhancement. Thus, the discussion of proceeding with a bench trial or stipulated fact trial clearly was not tied to an agreement that the government would not seek the sentencing enhancement.

In contrast, Cotterman's multiple written and verbal waivers immediately before trial demonstrate that he understood that the choice to proceed without a jury trial was his alone. In his amended §2255 petition, he notes that Cotterman "was reluctant to submit to a bench trial because of a previous bad experience." (CV 49, p. 27.) That is, in his 1992 case, he waived jury trial, was found guilty and sent to prison. (CV 49, Ex. E, ¶ 4 .) Cotterman had

---

[4] The government has filed a motion to strike these letters because they are not a part of the court record and were obtained in violation of Rules 6 and 7 of the Rules Governing 2255 Proceedings. The government also requested that the Court strike arguments based on these improper submissions. To the extent that the Court decides to consider them, the government has included in this response references to the letters.

experience with the criminal justice system and had been through a trial before where he chose to proceed with a bench trial instead of a jury trial. His prior experience establishes that he knew his trial options and had the ability to make his own decision regarding how the trial would proceed. Trial counsel has asserted that Cotterman was a very involved client, who actively participated in strategic process, and "was the ultimate decision maker in making choices pertaining to his defense. (Affidavit of Alfred Donau, III, ¶ 5.) Trial counsel also has averred that he fully explained Cotterman's rights to him prior to the waiver, and that Cotterman was "aware of the ramification of a jury waiver as he had done exactly that before." (See Affidavit of Alfred Donau, III, ¶ 11.)

3. <u>Counsel was not Ineffective for Advising Cotterman to Proceed with a Bench Trial</u>.

The Supreme Court has long recognized that a criminal defendant may have sound tactical reasons for relinquishing a jury trial in favor of a bench trial. *See Adams v. United States ex. rel. McCann*, 317 U.S. 269, 278 (1942) ("And since trial by jury confers burdens as well as benefits, an accused should be permitted to forego its privileges when his competent judgment counsels him that his interests are safer in the keeping of the judge than of the jury.") Considering the nature of the charges and the evidence, and the fact that Cotterman intended to assert defenses regarding the legal nature and purpose of the photographs and videos, and whether they constituted child pornography under the law, it is logical that the defendant would want a trial in front of a judge instead of a jury.

The record establishes that Cotterman's waiver was knowing and intelligent. Cotterman knew that he had the power to choose how his trial proceeded. He had experience with a bench trial and the criminal justice system. He signed a waiver of jury trial. He acknowledged that in a pretrial hearing he heard trial counsel inform the judge that he intended to proceed with a bench trial. Furthermore, he averred on the first day of trial that it was his desire to waive his right to a jury trial, that he had discussed it with trial counsel, and that he was making the choice of his own free will. The possibility that part of his reasoning for waiving a jury trial was based on a misunderstanding of his potential sentence exposure does not render his waiver invalid, because it does not establish that his

waiver was not "knowing and intelligent." *Shorty*, 741 F.3d at 965–66. In fact, his consideration of those factors serves as further indication that Cotterman carefully weighed his trial options. Cotterman's waiver was voluntary, knowing, and intelligent. The trial court did not err with respect to the waiver.

Waiver of a jury trial in a case with facts such as the ones here may well have been a tactical decision to avoid having twelve people exposed to distressing sex abuse images and stories which would be far more likely to inflame a juror than a judge, who has experience with such cases. In fact, trial counsel believed that by proceeding with a bench trial, the judge would be less likely to be influenced by the emotional content of the evidence and the court would be more open to legal argument about what constituted pornography and obscene materials. (See Affidavit of Alfred Donau, III, ¶ 10.) Counsel's recommendation to his client to avoid this prejudice is a tactical decision. Such a tactical decision cannot constitute ineffectiveness. *See Fountain v. Yates*, No. CV S 04–2350 GEB DAD P, 2006 WL 1627906, *10 (E.D. Cal. June 8, 2006) ("A tactical decision with which defendant later disagrees is not a basis for a claim of ineffective assistance of counsel.")

4. Defendant Fails to Meet his Burden to Show Prejudice.

Most importantly, the defendant cannot establish that any prejudice resulted from the bench trial. He has not even argued that there is a reasonable probability that, had he not waived his right to a jury trial, the result of his trial would have been different. He simply asserts that a jury would have been able to evaluate all the evidence, as the trial judge did, but fails to explain how a jury would reach a different conclusion than the judge. Given the overwhelming strength of the evidence in this case, there is no reason to expect that a jury verdict would have been anything other than guilty. *Revels v. United States*, No. C14-5896BHS, 2016 WL 4799701 at *5 (W.D. Wash. October 5, 2016), *aff'd*, 738 F. App'x 445 (9th Cir. 2018) (Defendant fails to show the result of a jury trial would have been different, and therefore failed to establish the second prong of *Strickland*.) Having failed to establish either *Strickland* prong on any of his claims, the § 2255 motion should be denied.

- 23 -

5. <u>Defendant Fails to Show Appellate Counsel was Ineffective for not Arguing the Waiver of Jury Trial was Defective in his Direct Appeal.</u>

As the defendant cannot show his jury trial waiver was involuntary or defective, he cannot show that appellate counsel was ineffective for not raising the issue on appeal. Counsel is not required to raise issues on appeal that would be futile.

> "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes*, 103 S. Ct. 3308, 3313 (1983). "[A] lawyer who throws in every arguable point—'just in case'—is likely to serve [his] client less effectively than one who concentrates solely on the strong arguments." *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989). To impose a duty "to raise every 'colorable' claim suggested by a client would disserve the ... goal of vigorous and effective advocacy." *Barnes*, 463 U.S. at 754. "Appellate counsel will therefore frequently remain above an objective standard of competence (prong one) and have caused [his] client no prejudice (prong two) for the same reason—because [he] declined to raise a weak issue." *Miller*, 882 F.2d at 1434. The failure to raise even a "proper" issue on appeal is not ineffective if counsel is "within the bounds of professional conduct in abandoning the ... argument and focusing on stronger issues." *Paradis v. Arave*, 954 F.2d 1483, 1494 (9th Cir. 1992).

*Tabatabai v. United States*, No. CR 05-00744 MMM, 2015 WL 13703208, at *5 (C.D. Cal. July 17, 2015). None of the arguments defendant asserts appellate counsel should have raised are so strong that counsel's failure to appeal on that basis constituted ineffective assistance.

6. <u>Defendant's Claims that the District Court Plainly Erred are Procedurally Defaulted.</u>

To the extent the defendant is asserting a separate claim that the district court plainly erred because the defendant was not adequately informed of his right to testify is procedurally defaulted under the cause and prejudice standard discussed in *United States v. Frady*, 456 U.S. 152, 168 (1982), because he did not raise it on direct appeal. In his § 2255 motion, the defendant makes no effort to demonstrate that some external factor impeded his effort to raise the claim on appeal. He simply contradicts his trial counsel's claim that he was aware of and involved in the decision, and then asserts that trial counsel was ineffective in not advising him of his right to testify and that appellate counsel was ineffective for not raising the issue on appeal. In addition, he argues that the trial court

erred by not informing him of his right to testify, despite the absence of any such duty. (CV 49, pp. 1, 3, 28-32.) Cotterman offers no evidence to establish that this alleged failure to advise worked to his actual and substantial disadvantage. The defendant does not claim that he is innocent of the charges, and the overwhelming nature of the evidence establishes that even if there had been a failure to advise him of his right, the outcome would not have been different.

### D. Ground 3: Cotterman Was Fully Informed of His Right to Testify.

Cotterman asserts that he was deprived of his constitutional right to testify and received ineffective assistance from both his trial and appellate counsel for not advising him that the decision to testify was his own, and failing to raise the deprivation of his right on appeal. Cotterman argues that trial counsel was ineffective because he never considered calling him as a witness at the suppression hearing, and that trial counsel also made the decision, without consulting Cotterman, to not call him as a witness at trial. (CV 1 at 49-50.)

This is contradicted by defense counsel's statement that Cotterman was "well aware of his right to testify," that trial counsel "did advise him of this right," and specifically advised him that the right to testify "was his right alone, and his decision to testify or not." (See Affidavit of Alfred Donau, III, ¶ 17.) Further, trial counsel has stated that if Cotterman "had insisted on testifying, he would have testified." (See Affidavit of Alfred Donau, III, ¶ 19.) It is trial counsel's practice to advise all clients of these rights. (Affidavit of Alfred Donau, III, ¶ 17.) Finally, Cotterman claims that he told trial counsel he [Cotterman] thought it was a mistake that he had not testified in his trial in 1992. (CV 49, Ex. E, ¶ 6.) This indicates that Cotterman was fully aware of his right to testify and his ability to choose not to testify.

Defendant's claim that trial counsel refused to let him testify is contradicted by the record. Counsel stated in open court that they had decided not to put on any evidence. (RT 06/10/2014 at 169.) When trial counsel made this announcement, Cotterman did not contradict him, or assert that he wished to testify. A petitioner's assertion that counsel refused to allow him to testify is insufficient, by itself, to establish ineffectiveness. *See*

*generally Underwood v. Clark*, 439 F.2d 473 (7th Cir. 1991). If counsel states that a defendant will not be testifying, "the defendant's assent is presumed." *Id*. at 551. A defendant who wishes to testify against his counsel's advice may exercise that right "by insisting on testifying, communicating with the trial court, or discharging counsel." *Id*. He must "alert the trial court that he desires to testify or that there is a disagreement with counsel regarding whether he should take the stand." *Gonzales v. Elo*, 233 F.3d 348, 357 (6th Cir. 2000). If a defendant fails to do so, waiver is presumed. *Id*.

Cotterman further asserts that the judge failed to conduct a colloquy with him to ensure his knowledge of his right to testify, or that he voluntarily, knowingly and intelligently waived that right. (CV 49, pp. 36-37.) Cotterman contends that, "in light of the facts of this case," the trial court "should have obtained an affirmative waiver and advised Cotterman that he had a constitutional right to testify and that, should he choose to do so, he would not waive his privilege against self-incrimination." *Id*. at 37. In support of his assertion, Cotterman cites a Maine district court decision, and state court opinions from Alabama and Arizona, none of which are controlling authority. (CV 49 p. 37, citing *United States v. Butts*, 630 F.Supp. 1145 (D. Me. 1986), *Lavigne v. State*, 812 P.2d 217 (Ala. 1991), and *State v. Lee*, 142 Ariz. 210 (1984)).

In fact, the court has no obligation to inquire of the defendant as to whether the defendant knows of his right to testify and if he wishes to waive that right. *United States v. Yee Soon Shin*, 953 F.2d 559, 561 (9th Cir. 1992); see also *United States. v. Martinez*, 883 F.2d 750 (9th Cir. 1989); *United States v. Edwards*, 897 F.2d 445 (9th Cir. 1990); *United States v. Joelson*, 7 F.3d 174 (9th Cir. 1993). Cotterman argues that the record is devoid of information showing that he was consulted on his right to testify. This is not correct. Instead, as explained above, the defendant was fully informed of his right to testify, and his option to waive that right. Moreover, he had prior experience in waiving his right to testify, and chose to do so in his prior criminal case that had occurred 22 years before.

As with his other claims, there was no prejudice here. Cotterman offers no evidence to establish that, but for this alleged failure to advise, there is a reasonable probability that the outcome of the trial would have been different. The defendant claims that if he had testified, he would have explained, among other things, the "true facts" surrounding his prior conviction, explained his relationship with the victim and the problems she had at school, testified that he never removed the victim's clothing, explained how SA Owen's forensic examination of his computer was incorrect, explained "why he took the photographs . . . and demonstrate that they were non-sexually explicit," explained the financial help he gave the victim, and established that the victim's claim of being molested only happened after she was shown the child pornography images produced by the defendant. (CV 1 at 65-68.) This testimony would have had no effect on the ultimate outcome of the case and likely would have been deemed irrelevant because it would not assist the trier of fact in evaluating the evidence related to the elements of the offenses. The evidence at trial against Cotterman was overwhelming, and if Cotterman's sentencing letter is any indication of what his testimony would have been, there is every reason to believe it would have been more damaging to his defense than helpful due to his complete failure to admit that his sexual interest led to the offenses. How his creation of a collage showing numerous close-up images of his victim's genitalia could be medical research is a mystery, as is why he would ever have kept the material with him when traveling abroad. His "non-sexually explicit" claims are even more incredible in light of his possession of the other images of child pornography in addition to those he created, as well as obscene stories about incest and sexual abuse of children.

Cotterman again fails to satisfy both prongs of the *Strickland* test on this claim. He has not established that there is a reasonable probability that, had he not waived his right and testified to the information listed in his motion, the result of his trial would have been different. These allegations do not warrant a hearing or any other relief.

Finally, any claim that defendant was not adequately informed of his right to testify is procedurally defaulted under the cause and prejudice standard discussed in *United States*

- 27 -

*v. Frady*, 456 U.S. 152, 168 (1982), because he did not raise it on direct appeal.  In his § 2255 motion, the defendant makes no effort to demonstrate that some external factor impeded his effort to raise the claim on appeal. He simply contradicts his trial counsel's claim that he was aware of and involved in the decision, and then asserts that trial counsel was ineffective in not advising him of his right to testify and that appellate counsel was ineffective for not raising the issue on appeal.  In addition, he argues that the trial court erred by not informing him of his right to testify, despite the absence of any such duty. Cotterman offers no evidence to establish that this alleged failure to advise worked to his actual and substantial disadvantage.  The defendant does not claim that he is innocent of the charges, and the overwhelming nature of the evidence establishes that even if there had been a failure to advise him of his right, the outcome would not have been different.

## E. Ground 4: Trial counsel provided effective assistance in regards to the stipulation of facts.

Cotterman asserts that he received ineffective assistance from his trial counsel when he was advised, and agreed to, enter into a stipulation of facts at trial.  The defendant now argues that trial counsel was ineffective because there was "absolutely no benefit (to him) by agreeing to the stipulations" and that, if he had not stipulated to these facts, the government would have had to prove the facts beyond a reasonable doubt and would have had to call additional witnesses.  (CV 49, p. 39.) Even apart from the fact that his entry into factual stipulations was voluntary and knowing, the absence of the stipulations would not have changed the outcome of the trial in any way, and can therefore not have prejudiced the defendant.

"The test regarding the validity of a stipulation is voluntariness." *United States v. Molina*, 596 F.3d 1166, 1168–69 (9th Cir. 2010).  "Stipulations freely and voluntarily entered into in criminal trials are as binding and enforceable as those entered into in civil actions."  *United States v. Technic Servs., Inc.*, 314 F.3d 1031, 1045 (9th Cir. 2002) (quoting *United States v. Gwaltney*, 790 F.2d 1378, 1386 (9th Cir.1986)), *overruled on*

*other grounds, United States v. Contreras*, 593 F.3d 1135 (9th Cir. 2010) (en banc). A "defendant who has stipulated to the admission of evidence cannot later complain about its admissibility" unless he can show that the stipulation was involuntary. *Technic Servs., Inc.*, 314 F.3d at 1045. "[S]tipulations serve both judicial economy and the convenience of the parties, [and] courts will enforce them absent indications of involuntary or uninformed consent." *Molina*, 596 F.3d at 1169 (quoting *CDN Inc. v. Kapes*, 197 F.3d 1256, 1258 (9th Cir. 1999). Moreover, the Ninth Circuit recognizes that "defense counsel may waive an accused's constitutional rights as a part of trial strategy." *United States v. Gamba*, 541 F.3d 895, 900 (9th Cir. 2008). Counsel's authority extends to waivers of the defendant's Sixth Amendment right to confrontation as a matter of trial tactics or strategy. *Wilson v. Gray*, 345 F.2d 282, 287–88 (9th Cir.1965). The law does not require that each party receive a "benefit" for the stipulation to be valid. Indeed, defendants frequently stipulate to readily provable evidence, where the only benefit is sparing the jury and court additional witnesses or time-consuming testimony of matters easily established. Such is the case here. Based on the other evidence presented at trial, there is no question that the government could have established each element of the offense and the truth of each stipulation.

Before trial, a stipulation was drafted listing certain facts that the government and the defendant, agreed to as stipulated facts. (Stipulations of Fact, CR 117.) In fact, multiple drafts of the "stipulations of fact" were created before the final version was signed by the parties and filed with the court. The defendant requested that changes be made to initial drafts, and requested the removal of some stipulations that were proposed by the government. The defendant even had the government include information which was to his benefit, such as stipulating that the non-produced child pornography was not produced by him. Cotterman, who was a "very involved" defendant, helped finalize the stipulations. (Affidavit of Alfred Donau, III, at ¶5.) For example, the document filed with the trial court shows a handmade amendment to stipulation 16 which defendant initialed before it was filed. (*Id.* at ¶ 6.)

Cotterman chose not stipulate to all of the elements required to prove the charges

against him at trial. He declined to stipulate to facts that would establish that he produced the child pornography, that the images depicted sexually explicit conduct, or that the victim depicted in the images was a pre-pubescent minor at the time they were created. (Stipulations of Fact, CR 117.) His participation in negotiating and drafting the stipulations suggests he did believe there was a benefit to him. In addition to simple time-savings, it is entirely reasonable to believe that the defendant may have wanted to stipulate to some of the facts to avoid public embarrassment resulting from detailed, lurid witness testimony or exhibits. He also may well have chosen to stipulate to the identity of his victim in order to spare her the need to examine the pictures during trial.

The defendant, his lawyer, and the attorney for the government all signed the stipulation. (CR 117.) The stipulation was admitted into evidence at trial as Exhibit 56. (Trial Exhibit List, CR 130.) At trial, the defendant did not object to the stipulation or the stipulation being filed as a trial exhibit, nor did he object to specific stipulations when they were discussed by both government and trial counsel at trial:

> [MS. CORBIN:] I just wanted to note that the defendant has stipulated on the stipulations that have been filed with the Court that he possessed the computer when he crossed the border into Arizona from Mexico and that it was his computer. He owned it.
> He's also stipulated that the photographs – I'm sorry. He's also stipulated that Exhibit 33, which is the photograph from the search warrant and the Truckee search warrant exhibit, that that was a depiction – as accurate depiction of his home in Truckee, California.

(RT 6/10/14 at 87-88.)

> [MS. CORBIN:] This is a video – Your Honor, I would ask that this be admitted into evidence. The defendant has stipulated that this was on his computer in the stipulations, and I was planning to ask Ms. Pabst if she recognized the individual in the – or individuals in this video….
> …
> MS. CORBIN: I'd ask that it be admitted, Your Honor.

> THE COURT: Exhibit 25 is admitted.

(RT 6/10/14 at 134.)

MS. DURYEE: Your Honor, we don't have any further witnesses. We do want to move some things into evidence, including the stipulations, which I'm assuming Your Honor doesn't need us to read into the record.

THE COURT: I don't need you to read them into the record.

. . .

So at this time, we move to admit Exhibits 1 through 33-J, many of which are subject of stipulations between the parties, and 41 through 45, 49 through 52. And we offer now as Exhibits 53 through 55 certified conviction documents and an information summary as well as a verdict from Santa Clara County, California.

THE COURT: Those last two documents, 53 through 55, I don't have those in front of me.

MS. DURYEE: We're working on that, Your Honor. We'll provide hard copies to the Court as well.

THE COURT: Mr. Donau?

MR. DONAU: Well, we did a stipulation that I thought did away with this, these abstracts.

MS. DURYEE: That wasn't -- that wasn't our understanding. I mean, the stipulation does address the fact of the convictions, but the Government's position is that the documents, the certified court documents, are admissible and should be accepted.

THE COURT: I'm looking at the stipulation just to make sure.

MR. DONAU: It's No. 1, Your Honor, of the stipulation.

THE COURT: It is. I don't know that you really need the documents for the purposes of this hearing.

MS. DURYEE: We'd like them in the record though.

THE COURT: They'll be in the record.

MR. DONAU: And I object to their admission in the record based upon the fact that we have a stipulation. I haven't seen any certified copies. I assume that they provided the Court with certified copies.

THE COURT: That's what I was just saying, I didn't have the hard copies.

MS. DURYEE: In addition, 56 is the stipulations of fact, and 57 the metadata summary chart. We move for admission of all of those.

THE COURT: Any objection to 57?

MR. DONAU: I didn't hear the last part.

THE COURT: 57.

MR. DONAU: The metadata?

THE COURT: The metadata summary chart that the first witness testified from.

MR. DONAU: That's -- we've -- wasn't that included?

MS. DURYEE: It may have been. It's not marked on this list, so out of abundance of caution, I'm making sure that all the exhibits that we need are admitted.

MR. DONAU: My position is, if we stipulated, I have no objection.

THE COURT: It'll be admitted.

MS. DURYEE: Thank you. The Government rests.

(RT 6/10/14 at 164-167.)

The defendant's involvement in the stipulation decisions is further demonstrated by the following portion of trial, when addressing the issue of why his wife was excluded from the courtroom as a necessary witness:

MS. DURYEE: We wanted to put a couple things on the record. The Government, prior to the first witness' testimony, did offer to release Maureen Cotterman from the subpoena if we were given a stipulation that

the ring shown was Mr. Cotterman's ring. They chose not to do that and that was their right. I just wanted the Court to know that. We wanted Court to make a ruling that the Government was permitted to use a mirror image of the hard drive because the original was inadvertently destroyed.

THE COURT: You guys stipulated to that.

MS. DURYEE: The inadvertent destruction would be a Court finding, I think.

MR. DONAU: We agreed, and I take it the Government -- we didn't get evidence from a witness, but I will accept an avowal from the Government that the computer was inadvertently destroyed, not by Mr. Owen, who is not present, but by some other Government official. If that avowal is made on the record, that is sufficient to our agreement.

THE COURT: Do you make that avowal?

MS. CORBIN: Yes. Yes, we make that avowal.

THE COURT: All right. I'll see you tomorrow at 10.

(RT 6/10/14 at 170-171.)[5]

At his sentencing hearing, Cotterman argued in mitigation that he "was willing to stipulate everything [he'd] done." (CR 162, RT, 9/29/14, p. 7, ll. 9-10.) Not only does this suggest another perceived advantage to entering into the stipulations, but it also underscores his inconsistency, first trying to profit from his choice and then later disavowing it. He cannot have it both ways.

Cotterman has failed to meet both prongs of the *Strickland* test in his claim regarding the stipulation of facts. He has failed to rebut the strong presumptions that his lawyer's conduct fell within the wide range of reasonable professional assistance and was sound

---

[5] The defendant raises this stipulation that the original hard drive had been inadvertently destroyed as another mistake, in his opinion. Like the other facts which were the subject of stipulations, though, the proof for the fact at issue would have been readily available: when an original hard drive is not available but there is a duplicate image of it, a forensic examiner is able to easily verify the integrity of the copy by matching up "hash values" (completely unique alpha-numeric identifiers, akin to fingerprints) for the two sets of data.

trial strategy. *Strickland*, 466 U.S. at 689. He also cannot show that the outcome was influenced by the alleged ineffectiveness. While he correctly asserts that the government would have had to prove the stipulated facts beyond a reasonable doubt and thereby would have had to call additional witness, he has not established that this would have changed the trial outcome. A review of the stipulations shows that they were readily provable, despite requiring additional witnesses and trial days. Given the proof in this case, there is no reason to doubt that the verdict would have remained the same.

F. **Ground 5: Trial And Appellate Counsel Provided Effective Assistance In Regards To The Sexually Explicit Conduct Depicted In The Photos And Videos.**

Cotterman contends that his counsel "ineffectively" challenged the sexually explicit conduct depicted in photographs and argue that the photos and videos of the child victim in this case did not constitute child pornography. Specifically, Cotterman asserts that the images were not child pornography because they did not depict sexual acts and the child victim did not engage in any sexual acts during the taking of the photos and videos. (CV 49, pp. 42-49.) This defense was raised at trial, but failed. The argument was not, and is not, supported by case law or the evidence in this case.

Specifically, Cotterman agrees that the images he created "depicted the [child's] pubic area and in some instances, at the edge of the vaginal area, [Cotterman's] hand opening the vaginal area so it could be photographed." (CV 49, p. 43.) He argues, however, that the photos were not sexual, and "arguably" resemble photographs from a "human anatomy textbook," which did not meet the definition of lascivious. (CV 49, pp. 43-44.) Cotterman also asserts that trial and appellate counsel were ineffective because they did not effectively raise the argument that the photos and videos were not child pornography because the victim was not "engaged" in their creation because she was asleep at the time the photos and videos were taken. (CV 49, pp. 46-47.) Cotterman asserts that the wording of 18 U.S.C. § 2251(a), requires that the child "must do something" in order for child pornography to be created. (*Id.*, p. 47.) This argument is meritless. It also is deeply

offensive to the many sexual abuse victims who were assaulted while incapacitated, sleeping, or pretending to sleep as a reflex to trauma.

Cotterman maintains that trial counsel was ineffective because he failed to file a pre-trial motion on this issue, requesting that the court dismiss Counts 1 and 2 of the indictment. (CV 49, p. 43.) However, trial counsel elicited questions on this topic during cross-examination of HSI SA John Owen at trial, and also raised this argument in his closing statement. During trial, he asked the following:

> Q. [Trial Counsel]: Now, in the images you saw of the girl that's the subject matter of this prosecution, you testified at one time she appeared to move, and the camera was taken away and knocked over.
>
> A. [HSI SA John Owen]: Correct.
>
> Q. So did it appear to you at that time that she woke up or may have been waking up?
>
> A. Possibly.
>
> Q. Did all the other photographs where you could see her face, did it appear that she was asleep?
>
> A. Well, she had her eyes closed.
>
> Q. Okay. Well, did it appear she was asleep?
>
> A. Well, she had her eyes closed. Do you want my opinion on it?
>
> Q. No, I want to know what you saw.
>
> A. I saw her eyes were closed.
>
> Q. And you saw when she moved that the entire process stopped?
>
> A. Yes, at the end of the video.

(RT 6/10/14 at 108-109.) Trial counsel made this argument in his closing statement:

And so when you look at the requirements for production, Your Honor, and they are listed in – there are six factors in determining: that the victim – that the defendant employed, which not in this case, did not employ the victim; did not persuade the victim because the victim was not aware; did not induce the victim because the victim was not aware; or entice her, which didn't occur, to engage in explicit sexual conduct. The only term that can remotely be applied to this case is "used" to produce sexual explicit conduct.

(RT 6/11/14 24-25.)

The Court disagreed with these arguments and found that the images and videos constituted child pornography.

The term "sexually explicit conduct" means actual or simulated sexual intercourse (including genital-genital, oral-genital, anal-genital, or oral-anal), bestiality, masturbation, sadistic or masochistic abuse, and the lascivious exhibition of the genitals or pubic area of any person. 18 U.S.C. § 2256(2). In determining what constitutes a "lascivious exhibition," courts generally look to six factors:

1) whether the focal point of the visual depiction is on the child's genitalia or pubic area;

2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;

3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;

4) whether the child is fully or partially clothed, or nude;

5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;

6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

*United States v. Overton,* 573 F.3d 679, 686 (9th Cir. 2009); *United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986), *aff'd sub nom. United States v. Weigand*, 812 F.2d 1239 (9th Cir. 1987). The factors "are neither exclusive nor conclusive, but operate as merely 'a starting point' for determining whether a particular image is 'so presented by the

photographer as to arouse or satisfy the sexual cravings of a voyeur.'" *Overton*, 573 F.3d at 686 (citation omitted). The fact-finder should not be made to rely on the so-called *Dost* factors "with precision to reach a mathematical result, or to weigh or count them, or to rely on them exclusively." *Id.* at 686-87 (internal quotation marks and citation omitted). *Dost* itself recognizes that a visual depiction "need not involve all of these factors to be a 'lascivious exhibition of the genitals or pubic area.'" 636 F. Supp. at 832. Rather, the determination is made "based on the overall content of the visual depiction, taking into account the age of the minor." *Id.*

The trial court correctly found that the images and videos in this case qualified as child pornography, and, as will be discussed below in more detail, application of the *Dost* factors here more than supported the finding that the depictions met the legal definition of child pornography.

The Ninth Circuit has held that "use" under the statute does not require participation by the minor. *United States v. Laursen*, 847 F.3d 1026, 1031-33 (9th Cir. 2017).

> Our reasoning is consistent with the rulings of our sister circuits, which have broadly interpreted the "use" element of the statute. *See*, *e.g.*, *United States v. Sirois*, 87 F.3d 34, 42 (2d Cir. 1996) (defining "use" as occurring whenever a minor is the subject of the photography). Recently, the Sixth Circuit adopted the Second Circuit's interpretation of "use," similarly holding that this element is "fully satisfied for the purposes of the child pornography statute if a child is photographed in order to create pornography." *United States v. Wright*, 774 F.3d 1085, 1090 (6th Cir. 2014) (citation omitted). The Sixth Circuit explicitly rejected Wright's argument that the statute required proof of coercive conduct. *See id.* at 1091. The Eighth Circuit also agreed with the Second Circuit that the "use of a minor" element is satisfied even without solicitation or enticement if a defendant photographs a minor. *See United States v. Fadl*, 498 F.3d 862, 866 (8th Cir. 2007). In addition, the First Circuit recently upheld a defendant's conviction under § 2251 (a), even though he was in a consensual relationship with a fourteen-year-old, holding that "the statutory definition of 'use' is met when a defendant makes a minor the subject of a visual depiction by intentionally photographing the minor engaging in sexually explicit conduct." *Ortiz–Graulau v. United States*, 756 F.3d 12, 18–19 (1st Cir. 2014), *cert. denied*, —— U.S. ——, 135 S.Ct. 1438, 191 L.Ed.2d 395 (2015).

*Id.* at 1033.  Other circuits have agreed.  *See, e.g., United States v. Finley*, 726 F.3d 483 (3d Cir. 2013)(District Court properly instructed the jury that a sleeping child can "engage in" sexually explicit conduct), *cert. denied*, 135 S. Ct 259 (2014); and *United States v. Nichols*, 527 F. App'x 344 (6th Cir. 2013), *cert. denied*, 134 S. Ct. 359 (2013)(lasciviousness does not depend on a victim's state of consciousness.)

In support of his argument that the child must "do" something, the defendant cites *United States v. Carroll,* 227 F.3d 486 (5th Cir. 2000), but *Carroll* does not apply here. In *Carroll,* the Fifth Circuit remanded the matter for resentencing based upon the government's concession of error with respect to one of the victims upon whom the district court had based its sentence. *Id.* at 488.  That victim's face was superimposed on a pornographic image of a different body, so the nude body depicted in the image was not that of the child. The government conceded that the defendant's conduct in manipulating an image of the victim's face and superimposing it on a picture depicting the genitals of an unknown person did not fall within the meaning of the child pornography statutes. *Id.* The court in *Carroll* did not, however, as suggested by the defendant, hold that a sleeping child is incapable of engaging in sexually explicit conduct, or that any participation or engagement of the child is required.[6]

The "engagement" argument has also been rejected repeatedly in decisions finding surreptitiously recorded videos to constitute child pornography.  In *United States v. Johnson*, 639 F.3d 433 (8th Cir. 2011), the Eighth Circuit reinstated a jury verdict finding

_____

[6] Likewise unhelpful to the defendant is the Fourth Circuit's recent decision in *United States v. Howard*, 968 F.3d 717 (7th Cir. 2020), where, in a break with other Circuits, the Seventh Circuit found that videos of the defendant masturbating over a fully clothed and sleeping child did not constitute child pornography under the statute.  The court in *Howard* distinguished cases involving sleeping or drugged children who were photographed nude or partially nude, specifically citing *Laursen*, 847 F.3d at 1030 n.2, (minor nude and in pornographic poses); *United States v. Finley*, 726 F.3d 483, 488–89 (3d Cir. 2013) ("explicit contact" made with sleeping minor); *United States v. Vowell*, 516 F.3d 503, 507 (6th Cir. 2008) ("various sexual acts" performed on the body of a sleeping and drugged minor); and *United States v. Wolf*, 890 F.2d 241, 242 (10th Cir. 1989) (partially nude and sleeping minor), as having "all involved visual images clearly depicting minors engaged in sexually explicit conduct." *Howard*, 968 F. 3d at 723.

a weightlifting coach guilty of attempted production of child pornography. Over an 18-month period, the Coach secretly videotaped two minor girls stripping naked and weighing themselves in an examination room at the sports medicine clinic. Some of the clips showed the girls' pubic areas (but not genitals) as they stood on the scale and moved around the room. Although the court was reviewing the sufficiency of the evidence for a conviction for attempted production of child pornography, it nonetheless analyzed the defendant's attempt in the context of the *Dost* factors. The court concluded that a "reasonable jury could draw a reasonable inference that Johnson intended the videos to be sexual in nature and to elicit a sexual response in the viewer," notwithstanding the lack of any overt sexual activity by the victims. *Id.* at 441. The court noted that, in some of the videos, Johnson used the zoom feature to record close up shots of "the area the where the females' genitals would be if they were to face the camera" and that one of the videos "would clearly have met the first *Dost* factor if the minor would have merely turned around." *Id.*, at 440. In addition, the court found it a reasonable inference that Johnson "attempted to obtain images portraying them as sexual objects and that their facial features were apparently of little or no importance" because the videos captured the girls from their shoulders to their calves. *Id*. As to the final *Dost* factor, the court concluded that Johnson's (1) surreptitious recording of girls disrobing and (2) statements that he recorded the girls because he was curious as to what they would look like nude and because his "pervertedness got the best of [him]" suggested that he intended the videos to elicit a sexual response in the viewer. *Id.* The court added that "[a] reasonable jury could conclude that these videos of teenage minor females disrobing and weighing themselves in the nude cannot reasonably be compared to innocent family photos, clinical depictions, or works of art." *Id.* at 439.

In *United States v. Clark*, No. 09-33, 2010 WL 3488138 (D. Del. 2010), a jury convicted Clark of attempted production and production of child pornography based on his surreptitious recording of a minor victim undressing in a bathroom on eight occasions, and showering on a ninth. The videos contained numerous, albeit fleeting, captures of the victim's pubic area at distances ranging from inches to a few feet from the camera, and at

different angles, as she moved around the bathroom. In denying Clark's post-trial motion for acquittal, the district court held that the jury could have reasonably concluded that the recorded images constituted the "lascivious exhibition of the genitals or pubic area," and found Clark guilty of production of child pornography on eight counts. *Id.* at *7. On the ninth count, the court relied on the same evidence to find that the jury reasonably convicted Clark of attempted production of child pornography. *Id.* at *7, n 5.

In employing the *Dost* factors, the *Clark* court noted that the child's face was not shown, and that although the girl's pose was not "unnatural," the surreptitious, close-up recording of the naked girl "weighed in favor of lasciviousness." *Id.* at *6. Finally, the jury could have concluded that the depictions were intended or designed to elicit a sexual response in the viewer, "as [each] was planned for an audience consisting of Clark and likeminded individuals." *Id.* at *6. (citing *Knox*, 32 F.3d at 747)("lasciviousness is not a characteristic of the child photographed but of the exhibition which the photographer sets up for an audience that consists of himself or likeminded pedophiles.") *See also United States v. Banks*, 2009 WL 455491, at *10 (9th Cir. 2009) ("This focus results in a definition of lasciviousness that criminalizes images 'so presented by the photographer as to arouse or satisfy the sexual cravings of a voyeur.").

The Tenth Circuit also employed the *Dost* factors to affirm a Section 2251(a) conviction based on surreptitious bathroom videotaping of a minor in *United States v. Helton*, 302 Fed. Appx. 842 (10th Cir. 2008) (unpublished). There, the defendant hid a camcorder at foot-level in his bathroom, focusing the lens on the toilet. The camera recorded a minor female sitting on the toilet for several minutes, then standing and pulling up her underwear, the image of which appears in the center of the focused area. Helton also possessed an additional 247 items revealing his "preoccupation with images of women and girls in their underwear." *Id.* at 845. On appeal, Helton argued that that the charged video did not depict the "lascivious exhibition of the genitals" and therefore could not support his conviction for production of child pornography. Rejecting that argument and affirming the conviction, the court held that Section 2251 "does not specify the genitals or pubic area

must be fully or partially uncovered in order to constitute an exhibition and, like our sister circuits, we decline to read such a requirement into the statute." *Id.* at 846- 47. The court also concluded that the video was "intended to elicit a sexual response in the viewer," which it "defined as [defendant] and likeminded individuals." *Id.* at 848. The court emphasized the district court's conclusion that Helton "had an 'extreme interest in visual depictions of female underpants'" as strong evidence of his lascivious intent. *Id.* at 849.

In this case, like the ones cited above, there is no real question that the defendant's intent was sexual and lascivious. Many of the photos and videos created by the defendant depicted the child victim in bed wearing only a t-shirt, but most of them showed only her genitalia as the focal point, in a very close up fashion, and in some cases with his trembling hand touching her. The defendant also created at least one collage showcasing numerous photographs of his victim's vagina, which hardly is suggestive of "medical-type" images. His sexual and lewd intent is only further confirmed by the fact that defendant kept these images along with other depictions of sex abuse of other children, and over 300 stories about having sex with children, including family members.

The evidence was more than sufficient to allow the judge to convict Cotterman of production of child pornography, as charged in counts 1 and 2. Moreover, the defendant has not established ineffective assistance by either trial or appellate counsel. In fact, trial counsel did raise this argument at trial and in his sentencing brief filed with the trial court. (Defense Sentencing Memorandum, CR 140 at 2-3.) The arguments that the images were not sexually explicit did not fail because they were ineffectively made. They failed because they were not supported by case law, the evidence, or by common sense. Appellate counsel would not be ineffective for not raising this issue on appeal, as it would be a weak legal argument that would detract from stronger arguments. This is particularly true when one considers the facts that the images show Cotterman touching the victim's vagina.

The defendant has again failed to meet both prongs of the *Strickland* test.

### G. **Ground 6: Trial And Appellate Counsel Provided Effective Assistance In Regards To Sentencing.**

Cotterman asserts that he received ineffective assistance from his trial and appellate counsel when they failed to advocate for a reduction in his sentence due to his acceptance of responsibility. (CV 49, pp. 49-55.) The defendant has failed to meet both prongs of the *Strickland* test on his sentencing claims.

Under U.S.S.G. § 3E1.1, to receive a sentence adjustment for acceptance of responsibility:

> [A] defendant must, in addition to accepting responsibility for his offense, "timely provid[e] complete information to the government concerning his own involvement in the offense" or "timely notify[ ] authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for a trial...." As the commentary to the provision advises, "a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility."

*United States v. Shrestha*, 86 F.3d 935, 939–40 (9th Cir. 1996). Assessment of the reduction for acceptance of responsibility where a defendant proceeds to trial is only appropriate in "rare situations." U.S.S.G. § 3E1.1(a), n.2. This case would not be one of those rare situations. The defendant did not "go[] to trial to assert and preserve issues that do not relate to factual guilt." *See id.* The suppression issue had already been litigated pre-trial and resolved on appeal.

Defendant attempts to claim that he did not put the government to its test, therefore he was entitled to acceptance. (CV 49, p. 50.) However, his actions contradict that claim.

Following his contact with border officials, Cotterman did not make statements to officers admitting his offense. Instead, he fled the jurisdiction, and was eventually located in Australia. He was subsequently extradited from the jurisdiction by U.S. officials. Following his arrest, he did not make admissions to law enforcement. Cotterman contested his guilt throughout the seven years that this matter was litigated through an interlocutory

appeal, and continued to contest his guilt during the trial. At trial, Cotterman did not agree to stipulate to facts that would establish that he produced the child pornography, that the images depicted sexually explicit conduct, and that the victim depicted in the images was a pre-pubescent minor at the time they were created. (CR 117.) Cotterman contested the essential elements of his crime, including the venue for the production counts, whether the fantasy stories were "obscene," and whether there was sufficient evidence of engagement or sexually explicit conduct. (RT 06/11/2014 2-4, 20-29). The probation officer in Cotterman's presentence report noted that the defendant had done nothing to demonstrate acceptance of responsibility prior to trial. (PSR, CR 136 at 5, ¶20.) At sentencing, the defendant attempted to minimize his conduct:

> If I sound defensive with some of my statements, it's because, in fact, I've had to sit quietly through hours of what I would call in a lot of cases inflammatory statements made, some of which were simply wrong. . . . I was willing to stipulate to everything I'd done, the reasons I done them, and for the – and the motivations as well. . . .
>
> I think what really opened my eyes to the whole situation and what I was causing more than anything else was that no one involved, and I mean no one, acted in [Victim's] best interests. The agents who conducted the interview zealously pursued a conviction and so did the prosecution. [Victim's] mother, in her own words and also the words of the probation officer, are consumed with anger.
>
> And all of these elements and all of these factors conspired to put [Victim] back on the stand to relive the events and the trauma, and that was needless. . . .
>
> I deeply regret the loss of trust, the betrayal of trust for [Victim] and the distress I caused when I did not respect her space.

(CR 162, RT 9/29/14 at 6-14). In fact, he continues to minimize his behavior in the instant motion, and still tries to deny any sexual motivation for the conduct in this case as well as the conduct which led to his 1992 convictions. In his amended § 2255 Motion, he asserts that "while admitting it was inappropriate behavior for which he was truly remorseful, suggested that it was chronic, family curiosity that led him to take the photographs, and they were not taken for sexual purposes." (CV 49, p. at 44.)

A defendant cannot be subjected to more severe punishment for exercising his constitutional right to stand trial. But U.S.S.G. § 3E1.1 does not unconstitutionally penalize a defendant for exercising his right to trial. *See United States v. Gonzalez*, 897 F.2d 1018, 1020 (9th Cir. 1990). The reduction is simply inapplicable where the defendant puts the government to its burden of proof at trial, denies essential elements of guilt, and does not demonstrate true remorse. *See United States v. Innie,* 7 F.3d 840, 848 (9th Cir. 1990); see also U.S.S.G. § 3E1.1, n. 2 (2014) ("This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted ,and only then admits guilt and expresses remorse.") "A defendant who maintains [his] innocence at trial, and then purports to accept responsibility afterward, may have a difficult time persuading the trial judge that [his] later position is sincere rather than merely convenient." *United States v. Gonzales*, 897 F.2d 1018, 1020 (9th Cir. 1990) (quoting *United States v. Thomas*, 870 F.2d 174, 177 (9th Cir. 1989).

Further, the defendant has to truthfully admit the conduct compromising the offense of conviction and truthfully admit or not falsely deny any additional relevant conduct. The defendant's statements at sentencing contradict any sincere claim of acceptance of responsibility. As stated above, he continues to deny any sexual intent in taking the photos. The defendant fails to show sincere contrition for his actions, another requirement before the court must reduce his sentence for acceptance of responsibility pursuant to § 3E1.1(a). He claimed to be sorry for his actions, but then blamed the agents and the judicial system for further victimization of the child. Thus, it would have been futile for his trial or appellant counsel to assert he was entitled to acceptance of responsibility pursuant to 3E1.1(a).[7] He did not qualify for such a reduction, and even if he had, he has not shown a reasonable probability that, had his lawyers advocated for the reduction, it would have been

---

[7] Both trial counsel and appellate analyzed whether defendant might have been eligible for a reduction under § 3E1.1, and believed the evidence was insufficient to support the reduction. (See Affidavit of Alfred S. Donau, III, ¶ 23; CV 49, Ex. W, ¶ 4.) The decision not to raise a frivolous objection to the guideline calculation is not ineffective.

granted. The failure to raise a meritless legal argument does not constitute ineffective assistance of counsel.

Finally, the defendant cannot show prejudice. That is, he cannot show that a two-level reduction for acceptance of responsibility would have affected his sentence. The defendant's total offense level without the two level reduction for acceptance of responsibility was a level 43, which carries an advisory guideline of life. With the two level reduction, the advisory guideline for a criminal history category of II is 360 months to life. At the sentencing hearing, the court noted that while the guideline calculation was life, the statutory maximums for Counts 1 and 2 were only 30 years (360 months). As such, for counts 1 and 2, the court sentenced the defendant to the 30-year statutory maximum, each count to run concurrently. For count 3, the Court imposed a concurrent sentence of 20 years on Count 3, a concurrent sentence of 10 years on Count 5, and a consecutive sentence of five years on count 6. The sentences for counts 3, 5 & 6 also constituted the statutory maximums. The court noted that he was "confiden[t] that the sentence just imposed results in you spending the rest of your life in prison. The Court believes that's an appropriate sentence." (RT 09/29/14 25-26.) The record supports a finding that the sentencing guidelines, while calculated correctly, did not play a part in the court's determination of the appropriate sentence. As such, the defendant cannot show he would have received a lesser sentence had his counsel successfully argued for a two-level reduction for acceptance of responsibility. [8]

## H. Ground 7: Trial Counsel Provided Effective Assistance Throughout The Case

Cotterman asserts that he received ineffective assistance from his trial counsel when his trial counsel failed to "perform competently" at his motion to suppress, failed to file pretrial motions, failed to file a trial brief, failed to make an opening statement at trial, failed to "effectively" cross examine the government's witnesses at trial, and failed to

---

[8] The defendant's claim that the district court plainly erred by not granting him acceptance is also procedurally defaulted. For the reasons set forth above, this claim is also not supported by the record.

"effectively" represent the defendant at sentencing. (CV 49, pp. 55-66.) All of these arguments are without merit. The defendant fails to meet both prongs of the *Strickland* test on any of these claims.

Trial counsel in this case did file pre-trial motions, one of which held this case in pre-trial litigation for over seven years before it was brought to trial. The motion to suppress was filed by trial counsel on April 18, 2008 (CR 17), and, after the court's hearing on the motion, the trial court ruled in favor of the defendant. (Order, CR 71.) Cotterman fails to establish that trial counsel failed to perform competently at the suppression hearing.

The Ninth Circuit found that the evidence presented by the government met their burden to show that the evidence presented at the suppression hearing, when viewed collectively, supported a finding that the agents had reasonable suspicion for the forensic examination of the defendant's computer. The factors supporting reasonable suspicion include a TECs hit advising "that [Cotterman] appeared to [have] been involved in some type of child pornography[,]" that a review of his criminal record led agent's to believe he had a prior conviction for child pornography, that he was a sex offender "who travel[led] frequently out of the country" and "who was possibly involved in child sex tourism. This was confirmed by an agent's testimony that the defendant had traveled in and out of the country frequently since his 1992 conviction, visiting Mexico, which is a country associated with sex tourism. The alert was part of Operation Angel Watch, which targeted individuals potentially involved in sex tourism and alerting officials to be on the lookout for laptops, cameras and other paraphernalia of child pornography, which defendant had a collection of when he traveled down to Mexico and upon his return. *Cotterman,* 709 F.3d at 968-969. The files on his computer were also password-protected. Id.

Defendant claims, without providing evidentiary support other than his client's self-serving statements that Cotterman's travel outside the U.S. was not "frequent," but admits that his client "averaged about one trip a year outside the country." Which could mean his client, during the five-year period his passport was viable, traveled outside of the United States five times in one year, or once each year, which would be still be frequent in many

travelers' experience. The government did not present evidence that Cotterman had contact with law enforcement since his 1991 charges, so this was not a factor at issue in the Ninth's Circuit's finding that agents had reasonable suspicion to justify the search. The Ninth stated they were "inclined to find the initial search of Cotterman's laptop was reasonable, even without particularized suspicion. *Cotterman*, 709 F.3d at 961. Their issue was with the forensic examination which took place at a later date and time. *Id.* As such, agents did know the files were password protected at the time the forensic search took place. Finally, the defendant does not state how any expert opinion could have assisted in "debunking" any findings that the agents had reasonable suspicion. He merely states a generality, which is insufficient to support a finding of ineffective assistance of counsel. Defendant also tries to provide alternative reasons for why he had his electronics with him on this trip and why they were pass-coded. "Innocent possibilities…do not undermine reasonable suspicion." *Id.*, (quoting *Tiong*, 224 F.3d at 1140.)

Cotterman asserts that trial counsel was ineffective because he failed to file a pretrial motion to exclude an evidence admitted under 404(b). (CV 49, p. 58.) Cotterman noted, however, that this case was proceeding as a bench trial, so filing a motion to exclude such evidence would be futile since the judge in the case would learn of the evidence either by the motion or at trial. (CV 49, pp. 58-59.) And although the conviction was ten years old when it was admitted, a lapse of a decade or more does not make 404(b) evidence inadmissible when the prior wrong is so similar to the crime charged. *See United States v. Johnson*, 132 F.3d 1279, 1283 (9th Cir. 1997). As such, it would have been futile for counsel to move to exclude the 404(b) evidence. Counsel's decision to not pursue a futile motion cannot be ineffective assistance of counsel. *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (the failure to take futile action can never be deficient performance.)

In addition, the defendant fails to mention that he stipulated to some of the evidence, specifically his prior conviction, in the stipulations of fact that he signed and agreed to have filed with the court, and which were discussed in open court at the trial without objection.

In fact, the defendant himself discussed his prior conviction in the statement he made to the court at his sentencing hearing. (CR 162, RT 9/29/14 at 6-14.)

Cotterman also argues that trial counsel was ineffective at trial because he did not adequately cross-examine the government's witnesses, did not make an opening statement, did not obtain the child's school or psychological records, and did not make an effective closing argument. (CV 49, pp. 59-62.) He does not demonstrate how any information that could have been gained on cross-examination would have in any way altered the result of the trial. Opening statements are not evidence, and the evidence overwhelmingly showed that the videos and pictures were child pornography. The defendant admitted that the photos of the victim were on his computer, so he fails to demonstrate how her school or psychological records would have been relevant to, or assisted in, his defense. Speculative and conclusory allegations, without a showing of how the defendant was prejudiced, cannot support a finding of ineffective assistance of counsel.

Defendant further asserts that counsel should have objected to the introduction of evidence that Cotterman fled the country following the seizure of his property at the port-of-entry, and had obtained false identification documents. (CV 49, p. 61.) The defendant has presented no legal argument demonstrating why this evidence should have been excluded. Flight to avoid prosecution is relevant to show consciousness of guilt. *United States v. Harris*, 792 F.2d 866, 869 (9th Cir. 1986); *see also*, *United States v. Fox*, 627 F. App'x 608, 609 (9th Cir. 2015.) The seizure of Cotterman's computer took place on April 6, 2007. Between April 7th and April 12, 2007, Cotterman fled to Australia. (Indictment, Count 7.) Cotterman's actions in fleeing from the United States to Australia, via Mexico, Canada and Japan, and having a fake passport, strongly support an inference that his conduct constituted flight, which occurred due to a consciousness of guilt. This evidence was relevant, and not more prejudicial than probative. *United States v. Felix-Gutierez,* 940 f.2d 1200, 1207-08 (9th Cir. 1991.) Counsel cannot be ineffective for not contesting this information. Further, by stipulating to its admission, the dramatic nature of his flight was down-played.

Cotterman also asserts that trial counsel should have obtained a forensic tech expert to challenge Agent Owen's testimony and to corroborate his claims, claiming that an expert could have shown he "attempted to prevent pornographic material from downloading onto his computer, and could have guided trial counsel as to the effect of the destruction of the computer." (CV 49, p. 61.). This is a purely speculative claim, unsupported by the evidence, and would be contradicted by the presence of pictures showing the defendant's molestation of the minor victim. The defendant makes no showing of how he was prejudiced by not having his own expert examine the computers.

Cotterman repeats his plea bargaining argument that trial counsel was ineffective in advising him on his potential sentence because he did not file "a request for disclosure of guideline information." He argues that, because of this mistake, trial counsel encouraged and Cotterman agreed to proceed with a bench trial instead of a jury trial. Again, however, he fails to show how a jury trial would have altered the result of his trial, other than causing the government to prove the elements of the case beyond a reasonable doubt to a jury instead of a judge.

Finally, the defendant asserts that counsel essentially "abandoned" him at sentencing. This claim is not supported by the record.

First, the defendant asserts that both his counsel were ineffective when they failed to challenge some of the factual statements listed in the PSR regarding Cotterman's prior conviction. (CV 49, p. 63.) The defendant has not demonstrated that the statements contained in the PSR were false. In addition, the defendant also submitted a letter to the court contesting the account contained within the PSR. Counsel for the defendant also sent a letter to the federal PSR writer noting factual "errors" contained within the PSR, which were corrected. (CR 49, Exhibit AD, RT 09/29/14 3.)

Second, prior to sentencing, trial counsel submitted a sentencing memorandum on his client's behalf. (CR 49, Exhibit L; CR 140.) Trial counsel argued certain mitigating factors supported a lesser sentence, including the lack of evidence the defendant had downloaded any pornographic materials from the internet, and lack of evidence that he distributed any

of the pornographic materials. Trial counsel noted that there was no penetration of the victim, and the victim was unaware of the defendant's activities until after his arrest, thus limiting her suffering. Trial counsel further argued that any financial assistance to the victim or her family was not for the purpose of grooming. Finally, he noted the defendant's age, the amount of time he had already served for the offense in pre-trial custody without access to programs, services, or education. Counsel fails to assert any information or arguments that could have been brought to the court's attention that could have affected the court's determination of what a reasonable sentence should be.

Cotterman also asserts that trial counsel was ineffective for not seeking an independent psychiatric examination and claiming he asked that one be conducted. (CV 49, pp. 64-65.) The record contradicts this claim. First, the government requested a psychosexual examination in court. Trial counsel objected, and the defendant did not contradict him. (RT 06/11/2014 32.) The judge made the decision, not trial counsel, not to order a psychosexual examination because he was sure "Cotterman is going to maintain his right to appeal in this case and probably intends to do so,…. [and] it might reveal things damaging to him in that examination." (RT 06/11/2014 32.)

Second, Cotterman makes another speculative claim that had an examination been favorable, he might have received a reduced sentence, and that his counsel should have submitted the examinations that were conducted in his 1992 case. (CV 49, p. 65.) The defendant is a sexual offender, who preyed on his own trusting relative, molesting her during visits and documenting the abuse. The fact that this is a repeat offense contradicts the prior examiners beliefs that he was not a danger to the community, and renders the prior reports useless at best.

Finally, any claims that trial counsel should have argued for a lesser sentence based on sentencing disparity are forestalled by the Ninth Circuit's findings that the defendant's sentence was substantively reasonable given the troubling nature of the offense and his criminal history. *United States v. Cotterman*, 619 F. App'x 654 (9th Cir. 2015).

### III.    Conclusion

Cotterman has failed to rebut the presumption that his trial and appellate counsels' conduct fell outside the wide range of reasonable professional assistance, and show that there is a reasonable probability that, but for counsel's alleged unprofessional errors, the result of the proceeding would have been different. The evidence at trial was overwhelming and established Cotterman's guilt beyond a reasonable doubt.

For the foregoing reasons, the government respectfully asks this Court to deny the defendant's § 2255 motion in its entirety.

Respectfully submitted this 8th day of October, 2020.

> MICHAEL BAILEY
> United States Attorney
> District of Arizona
>
> */s/ Carin S. Duryee*
>
> CARIN S. DURYEE
> Assistant U.S. Attorney
>
> */s/ Shelley K.G. Clemens*
>
> SHELLEY K.G. CLEMENS
> Assistant U.S. Attorney

Copy of the foregoing served electronically
or by other means this _____ day of _____, 2020, to:

Robert Clay Hernandez, Esq.